[Cite as *State v. Kerr*, 2017-Ohio-8516.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

TOBY L. KERR,

    DEFENDANT-APPELLANT.

CASE NO. 1-17-01


O P I N I O N


Appeal from Allen County Common Pleas Court
Trial Court No. CR2016-0237

Judgment Reversed and Cause Remanded

Date of Decision:  November 13, 2017


APPEARANCES:

    *Linda Gabriele* for Appellant

    *Terri L. Kohlrieser* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Toby L. Kerr ("Kerr") appeals the judgment of the Allen County Court of Common Pleas for denying his motion to suppress. He challenges this decision on two grounds: (1) he asserts that the police did not have reasonable suspicion to conduct an investigatory stop of his vehicle; and (2) he asserts that the police did not have probable cause to conduct a warrantless search of his vehicle. For the reasons set forth below, the judgment of the lower court is reversed.

*Facts and Procedural History*

{¶2} On October 10, 2015, Officer Zane Slusher ("Slusher") was on patrol near a gas station in Lima, Ohio. Doc. 56 at 6. Though he had only one year of experience on the police force at this time, Slusher had been involved in several criminal investigations in this area and was aware that this location was known for having high levels of drug activity. *Id*. at 3, 7. At roughly 8:40 p.m., Slusher was sitting in his cruiser when he observed a car, which was driven by Kerr, pull into the gas station parking lot. *Id*. at 8. A pedestrian walked up to the vehicle, reached into the driver's side of the vehicle through the open window, then quickly turned around, and walked away. *Id*. The entire interaction between the pedestrian and the driver lasted only a few seconds. *Id*. at 10. Kerr then drove his vehicle out of the gas station parking lot, having never exited the vehicle while he was on the premises of the gas station. *Id*. at 10-11.

**{¶3}** At the time of this interaction, Slusher was about three hundred feet away from where this interaction occurred and was unable to determine what, if anything, was exchanged during this interaction. Though Slusher had never before witnessed a hand-to-hand drug transaction during his time in law enforcement, he believed that he had witnessed one of these illegal exchanges. *Id.* at 17. On the basis of his observations, Slusher radioed Officer Aaron Montgomery ("Montgomery") and informed him of this suspicious behavior. *Id.* at 34. On the basis of this information, Montgomery pursued the car described by Slusher, activated his lights, and conducted a stop of Kerr's vehicle. *Id.* at 35. At the suppression hearing, Montgomery testified that this was an investigatory stop based strictly on Slusher's observations as reported to Montgomery over the radio. *Id.* at 35-36.

**{¶4}** Montgomery's patrol car was equipped with a video and audio recorder, and the recording of this stop was admitted into evidence. Ex. A. The video shows that Montgomery pulled Kerr over at 8:41 p.m. *Id.* Montgomery testified that, as he approached Kerr's vehicle, he saw Kerr reaching around his seat with his right arm, making furtive movements, and "digging towards the center console." Doc. 56 at 36. Upon seeing these movements, Montgomery instructed Kerr to place his hands on the steering wheel and then ordered Kerr to come out of the vehicle. *Id.* at 37. Montgomery, who had a police dog with him

in his cruiser, warned Kerr that he would deploy the dog if Kerr was not cooperative. *Id.*

{¶5} Once Kerr was outside his vehicle, Montgomery informed him that he was being detained—not arrested—and handcuffed him. *Id.* Ex. A. Montgomery testified that he smelled the odor of alcohol as Kerr exited the vehicle. *Id.* at 38. The video shows that two other police officers arrived at the scene within thirty seconds of Montgomery approaching Kerr's vehicle. Ex. A. These two officers helped to handcuff Kerr and then escorted Kerr to the rear of his vehicle. *Id.* At this point, in the process of searching Kerr's person, one of the officers reached his hand into each of Kerr's pockets without first performing a pat-down of Kerr's outer clothing. *Id.*

{¶6} At 8:42 p.m., Slusher arrived at the scene and immediately told one of the officers supervising Kerr to put him in the back of his patrol car. Doc. 56 at 41. Ex. A. At this point, Montgomery had opened the rear, driver's side door of Kerr's vehicle and was searching the backseat. *Id.* While one officer and Slusher accompanied Kerr to one of the patrol cars, another officer remained with Montgomery at Kerr's vehicle. *Id.* Montgomery said to this remaining officer, "Man, we just gotta, we just gotta find it. He, uh, he put it back here with his right hand. Stuffed it back here in this back seat area. So we just need to find it." Ex. A. The remaining officer then walked from where Montgomery was standing to the other side of the vehicle, opened the rear door on the passenger's side of the

vehicle, and began searching the back seat. *Id.* Montgomery can be seen in the video pulling multiple articles of clothing out of the back seat area, shaking them outside of the vehicle, and then dropping them in the street. *Id.* During this process, Montgomery said, "I just gotta f****n' find it." *Id.*

**{¶7}** During the search, Montgomery and the other officer found a cup containing a beverage in the back seat. Doc. 56 at 39-40. The other officer with Montgomery asked, "Are you sure he wasn't settin' the drink in here, man?" *Id.* To which Montgomery replied, "No." *Id.* At this point in the recording, Montgomery can be seen removing a cup from the vehicle and can be heard saying, "I'm wondering if he didn't put it in the drink." *Id.* Montgomery then examined the contents of the cup and then stated, "Well, that's one thing he's freakin' out about. He's got alcohol in it." *Id.* As Slusher approached Kerr's vehicle, Montgomery turned towards Slusher and said, "Well the one thing he did for sure is he put that drink back there. But what else he put, we gotta find it." *Id.* At this point, Slusher is searching the area around the front seat on the driver's side of the vehicle, and another officer is still searching the back seat on the passenger's side of the vehicle. *Id.*

**{¶8}** Montgomery then turned again towards the vehicle and continued to search the area in the back seat on the driver's side of the vehicle until he found a small, empty baggie. Doc. 56 at 40. The baggie was found underneath a shirt in the back seat and was wet around the edges of the torn area as if this area had been

bitten off. *Id.* The outside of the bag had a "minor amount of * * * white residue" on it. *Id.* At the suppression hearing, Montgomery explained that he believed this white residue was cocaine, though there was not enough of it to perform a test. *Id.* at 40-41. Upon finding this baggie, the video shows that he remarked, "Oh, there it is. He f*****g ate it." *Id.* When the other officer asks, "What was it?" *Id.* Montgomery stated that he believed it to be, "F****n' crack. He f****n' ate it." *Id.* *See* Doc. 56 at 40-41. He then said, "Well, we can arrest him for tampering." Ex. A. Six seconds after Montgomery communicated what he had found, Slusher, who was searching the area around the front seat of the vehicle, can be heard on the tape, saying, "Uh-oh." *Id.* Ten seconds later, Slusher confirmed the discovery of contraband, saying, "Yep. We got crack." *Id.* The cocaine was in a cigarette pack that had been stored in a compartment in the front door on the driver's side of the vehicle. Doc. 56 at 14-15. When Slusher opened the cigarette pack, he found a brown, folded up piece of paper that had a few "off-white colored rocks inside." *Id.* at 15.

**{¶9}** On June 16, 2016, Kerr was indicted for possession of cocaine in violation of R.C. 2925.11(A), 2925.11(C)(4)(a) and pled not guilty. Doc. 1. Doc. 43. Kerr filed a motion to suppress on August 18, 2016. Doc. 21. The trial court held a suppression hearing on October 13, 2016. Doc. 56. After Slusher and Montgomery testified, the trial judge denied Kerr's motion to suppress, finding that the stop and subsequent search were legal. Doc. 36. On November 1, 2016,

however, Kerr changed his plea to no contest at which time the trial court found him guilty and entered a conviction for possession of cocaine. Doc. 43. The trial court then sentenced Kerr on December 15, 2016. Doc. 57.

{¶10} Kerr filed a notice of appeal on January 3, 2017. Doc. 48. On appeal, Kerr raises two assignments of error.

### First Assignment of Error

**The trial court erred in overruling the defendant-appellant's motion to suppress as law enforcement lacked reasonable suspicion to stop the defendant-appellant.**

### Second Assignment of Error

**The trial court erred in overruling the defendant-appellant's motion to suppress as law enforcement lacked probable cause to conduct a warrantless search of the defendant-appellant's vehicle.**

In this case, the resolution of the first assignment of error makes the issues raised in the second assignment of error moot. For this reason, we will analyze the first assignment of error only.

### *First Assignment of Error*

{¶11} In his first assignment of error, Kerr argues that the police did not have a reasonable and articulable suspicion to conduct a traffic stop of his vehicle. Kerr argues that the subsequent search of his vehicle was, therefore, illegal, and that the fruits of this search must be suppressed. For this reason, Kerr argues that the trial court erred by denying his motion to suppress the contraband that was

discovered in his vehicle. On the basis of these arguments, he requests that this Court reverse his conviction.

## Legal Standard

**{¶12}** The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." Fourth Amendment, United States Constitution. The Ohio Constitution offers a parallel provision to the Fourth Amendment of the Federal Constitution that has been held to afford the same level of protection as the United States Constitution. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997). "The primary purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers in order to 'safeguard the privacy and security of individuals against arbitrary [governmental] invasions.'" *State v. Carlson*, 102 Ohio App.3d 585, 592, 657 N.E.2d 591, 592 (9th Dist.1995), quoting *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, "[t]he touchstone of the Fourth Amendment is reasonableness." *Id*.

**{¶13}** A reviewing court must first determine whether a search or seizure within the meaning of the Fourth Amendment occurred. "In determining whether a particular encounter constitutes a 'seizure,' and thus implicates the Fourth Amendment, the question is whether, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was 'not free to leave,' or 'not free to decline the officers' requests or otherwise to terminate the encounter.'" *State v. Westover*, 2014-Ohio-1959, 10 N.E.3d 211, (10th Dist.), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Accordingly, a police stop of a motor vehicle and the resulting detention of its occupants has been held to be a seizure under the Fourth Amendment. *Prouse* at 653, citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-558, 96 S.Ct. 3074, 3082–3083, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

**{¶14}** The court must then determine what level of objective justification was required for the intrusion committed through this search or seizure. Police interactions with members of the public involve varying levels of intrusion into the constitutionally protected zone of privacy. *Westover* at ¶ 14 (holding The United States Supreme Court [has] recognize[d] three categories of police-citizen interactions: (1) a consensual encounter, which requires no objective justification

* * * (2) a brief investigatory stop or detention, which must be supported by reasonable suspicion of criminal activity * * *; and (3) a full-scale arrest, which must be supported by probable cause."). Under the Fourth Amendment, the level of intrusiveness involved in a traffic stop must be objectively justified by a reasonable, articulable, and particularized suspicion that criminal activity is afoot. *State v. Andrews*, 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991).

{¶15} Next, the court must determine whether law enforcement's actions conformed with the requisite legal standard. "The Supreme Court of Ohio has defined 'reasonable articulable suspicion' as 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [upon an individual's freedom of movement].'" *State v. Shaffer*, 2013-Ohio-3581, 4 N.E.3d 400, ¶ 18 (3d Dist.), quoting *State v. Bobo*, 37 Ohio St.3d 177, 178, 524 N.E.2d 489 (1988), quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13, quoting *State v. Jones*, 70 Ohio App.3d 554, 556–557, 591 N.E.2d 810 (1990), citing *Terry* at 27.

{¶16} The police conduct must be examined under the totality of the surrounding circumstances. *Andrews, supra*, at 88. Thus, "[t]he 'reasonable and

articulable suspicion' analysis is based on the *collection* of factors, not on the individual factors themselves." (Emphasis sic). *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 12, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 11. "Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Andrews, supra*, at 88-89, citing *United States v. Hall*, 525 F.2d 857, 859 (C.A.D.C.1976); *State v. Freeman*, 64 Ohio St.2d 291, 295, 474, 414 N.E.2d 1044, 1047 (1980). "A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement." *Andrews, supra*, at 89, citing *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981).

{¶17} Finally, the court must determine whether the evidence should be suppressed pursuant to the exclusionary rule. To deter Fourth Amendment violations, the Supreme Court of the United States has adopted an exclusionary rule under which "any evidence that is obtained during an unlawful search or seizure will be excluded from being used against the defendant." *State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Thus, suppression of illegally obtained evidence is generally the appropriate remedy for a Fourth Amendment violation. *State v. O'Neal*, 3d Dist. Allen No. 1-07-33,

2008-Ohio-512, ¶ 19. At a suppression hearing, the State has the burden of establishing that a warrantless search or seizure fell into an exception to the general rule that requires a warrant and complied with the Fourth Amendment standard of reasonableness. *State v. Morlock*, 3d Dist. Allen No. 1-12-21, 2013-Ohio-641, ¶ 12, citing *City of Xenia v. Wallace*, 37 Ohio St.3d 216, 524 N.E.2d 889 (1988).

{¶18} Under appellate review, motions to suppress present "mixed questions of law and fact." *State v. Yeaples*, 180 Ohio App.3d 720, 2009-Ohio-184, 907 N.E.2d 333, ¶ 20 (3d Dist.).

> **When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.**

(Citations omitted.) *State v. James*, 2016-Ohio-7262, 71 N.E.3d 1257, ¶ 8 (3d Dist.), quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

Legal Analysis

{¶19} In this case, the police stopped Kerr's vehicle. This action constituted a seizure within the meaning of the Fourth Amendment. In their testimony, the police not did claim to have had observed illegal activity—such as a

traffic violation—prior to the stop nor did the police aver to have had probable cause that Kerr had committed or was in the process of committing a crime. Thus, this was an investigatory traffic stop. To justify such a seizure under the Fourth Amendment, the police needed—at a minimum—a reasonable, articulable suspicion that criminal activity was afoot.

{¶20} In this case, a police officer witnessed a car pull into a gas station parking lot. The officer then saw a pedestrian walk up to this car, reach into one of the car's open windows, turn around, and walk back towards an apartment complex. In addition to this observation, the State points to several facts to argue that the police did have reasonable suspicion to conduct an investigatory traffic stop: (1) the police officer had received some training in drug enforcement; (2) the officer was located in an area known for high levels of drug activity; and (3) this interaction occurred in the evening.

{¶21} In turn, the Defense argues that the interaction that the police officer witnessed was not sufficient to give rise to a reasonable, articulable suspicion. The Defense points to several additional facts to support this contention: (1) the officer had only one year of patrol experience at this time; (2) the police officer could not determine whether money or contraband changed hands; (3) the officer had never before observed a hand-to-hand drug transaction; (4) the officer did not know the identity or history of either the pedestrian or the driver; (5) the officer was located one hundred yards away from this interaction; and (6) no other

criminal offense was observed at any point prior to the stop of Kerr's vehicle that could justify this seizure.

{¶22} After examining the record, we find that the facts available to the police at the time of the traffic stop—without more—do not constitute a reasonable, articulable suspicion that criminal activity was afoot. Under the totality of the circumstances, the activities the police officer observed were lawful in their appearance. He witnessed a pedestrian walk up to a car, reach inside, turn around, and walk away. *See State v. Pettegrew*, 8th Dist. Cuyahoga No. 91816, 2009-Ohio-4981; *State v. Scales*, 8th Dist. Cuyahoga No. 87023, 2006-Ohio-3946, ¶ 14. *Compare State v. Fletcher*, 8th Dist. Cuyahoga No. 88038, 2007-Ohio-989, ¶ 16; *State v. Reed*, 2017-Ohio-2644, --- N.E.3d ---, (5th Dist.).[1]

{¶23} From his vantage point, the police officer could not even determine whether an exchange had occurred between the pedestrian and Kerr. *See State v. Terrell*, 8th Dist. Cuyahoga No. 80676, 2002-Ohio-4913, ¶ 26 (holding reasonable suspicion existed where the officer saw money exchanged in a hand-to-hand transaction in an area known for high levels of drug activity but could not see if drugs were transferred). Thus, the police officer was not able to cite facts that

---

[1] In *Fletcher*, a police officer testified that he observed what he believed to be a hand-to-hand drug transaction in an area known for high levels of drug activity. *Fletcher* at ¶ 16. The Eighth District Court of Appeals distinguished the facts in *Fletcher* from those in *Pettegrew*, saying, "The officer must be able to testify that he saw a hand-to-hand exchange, which he believes was a drug transaction based on the area." *Pettegrew* at ¶ 20. The Court further noted that the officer in *Pettegrew* did not observe the defendant "and the unidentified male secretively or furtively exchang[e] something * * *." *Id*. We also note that the hand-to-hand transaction in *Fletcher* was undertaken while the defendant was on a bike. *Id*. In *Pettegrew*, as in the case presently before this Court, the defendant was sitting inside of a car, and the officer could not see whether an actual exchange occurred. *Id*. at ¶ 18.

articulated why his suspicions were raised by his observations. A belief that behavior, which is lawful in its appearance and unaccompanied by some indicia of sinister activities, was of a criminal nature is a mere hunch.

**{¶24}** Since the behavior of Kerr and the pedestrian was lawful in its appearance, the State's assertion that he had a reasonable and articulable suspicion ultimately rests upon the location and time of this interaction. An investigative stop is not justified simply because it occurred in an area that is known for high levels of criminal activity. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362–363 (1979). "To hold otherwise would result in the wholesale loss of the personal liberty of those with the misfortune of living in high crime areas." *State v. Carter*, 69 Ohio St.3d 57, 65, 630 N.E.2d 355, 362 (1994).

**{¶25}** Coupled with any additional indicator of suspicious behavior, this series of events may have given rise to the reasonable and articulable suspicion that was necessary to conduct a lawful investigatory stop of Kerr's vehicle. In the absence of additional indicators, however, the officer's belief that he had witnessed a hand-to-hand drug transaction was a mere hunch. The fact that the officer's hunch proved to be correct cannot justify this illegal stop post factum. Since the stop was not justified by reasonable and articulable suspicion, the fruits of the search that followed the investigatory traffic stop of Kerr's vehicle must be suppressed. For this reason, Kerr's first assignment of error is sustained.

*Second Assignment of Error*

**{¶26}** Since the first assignment of error, which addresses the legality of the investigatory stop of Kerr's vehicle, has been sustained, the questions raised under the second assignment of error, which concerns the legality of the search of Kerr's vehicle, are moot. For this reason, this Court declines to address these issues pursuant to App.R. 12(A)(1)(c).

*Conclusion*

**{¶27}** Having found error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is reversed. This matter is remanded to the trial court for further proceedings in accord with this opinion.

*Judgment Reversed*
*And Cause Remanded*

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**