[Cite as *State v. Hartfield*, 2023-Ohio-4708.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

MARCUS E. HARTFIELD,

    DEFENDANT-APPELLANT.

CASE NO. 13-23-04

O P I N I O N

Appeal from Seneca County Common Pleas Court
Trial Court No. 22-CR-0021

**Judgment Affirmed**

**Date of Decision:  December 26, 2023**

APPEARANCES:

    *Brian A. Smith* for Appellant

    *Derek W. DeVine* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Marcus E. Hartfield ("Hartfield") appeals the judgment of the Seneca County Court of Common Pleas, arguing that the trial court erred in denying his motion to suppress; that his sentence was contrary to law; and that the Reagan Tokes Law is unconstitutional. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} On January 23, 2022, Alexis Haudenshild ("Haudenshild") observed her neighbor's boyfriend, Hartfield, yelling as he walked around his yard with a gun. She testified that he was "just acting kind of off," describing his behavior as "erratic" and "paranoid." (Tr. 8). He was also getting in and out of a car that was parked outside of his trailer. Haudenshild testified that this situation "progressively got worse" and that he "was shooting" the gun with no one around him.[1] (Tr. 9). Haudenshild then decided to call 9-1-1.

{¶3} Deputy Christopher Potter ("Deputy Potter") was one of four officers from the Seneca County Sherriff's Office who responded to this call. He testified that the officers drove to the mobile home park, exited their cruisers, and approached Hartfield's trailer on foot. Since Hartfield reportedly had a gun, three of the officers had their service weapons drawn and pointed at the ground in a "low, ready"

---

[1] At the suppression hearing, Haudenshild indicated that she heard gunshots while she was inside the house and believed that the sounds came from the firearm that Hartfield was carrying. However, she also admitted that she did not report hearing gunshots when speaking to the 9-1-1 dispatcher.

position. (Tr. 72). Deputy Potter did not have his service weapon drawn when Hartfield emerged from the trailer.

{¶4} To ensure that Hartfield was not armed, Deputy Potter directed Hartfield to show them his hands. Deputy Potter then explained why the officers were present. At this point, Deputy Luke Cantu ("Deputy Cantu") asked for permission to conduct a pat down of Hartfield's person to determine if he had any weapons. Hartfield complied and was found to be unarmed. The officers then holstered their service weapons.

{¶5} Deputy Potter asked Hartfield "what was going on." (Tr. 40). Hartfield replied that "they were running around knocking on doors and hiding in sheds * * *." (Tr. 40). When Deputy Potter inquired into "who 'they' were," Hartfield said that "he didn't know but * * * they were out to get him." (Tr. 40). Deputy Potter then asked if Hartfield had a firearm. While he denied having a gun, Hartfield indicated that his girlfriend owned one and that he did not know where it was located. He also reported that his girlfriend was not home but that his daughter was sleeping inside the trailer.

{¶6} Deputy Potter testified that, at this point, he "asked him [Hartfield] if we could go inside and talk, and he said yeah." (Tr. 41). Deputy Potter testified that Hartfield then "walked up the stairs, opened the front door, stepped inside, held the door open for me." (Tr. 41). Once inside, the officers asked Hartfield to sit on the couch while they verified whether anyone else was in the trailer besides

Hartfield's juvenile daughter. Hartfield directed them to a room closed off by a curtain. Deputy Potter drew the curtain back, observed two children sleeping in the bedroom, and then returned to where Hartfield was located.

**{¶7}** Upon entering the trailer, Deputy Don Breidenbach ("Deputy Breidenbach") looked to his right and observed an open handgun case sitting on the kitchen table. He testified that, since he wanted to secure any readily accessible firearms, he went to examine the gun case. The case contained a loaded magazine but no handgun. Deputy Breidenbach then looked up and observed a bag filled with a white powdery substance on top of a freezer in the kitchen. This substance appeared to be cocaine. At this point, Hartfield was detained and informed of his *Miranda* rights.

**{¶8}** The deputies then contacted Detective Brandon Bell ("Detective Bell") of the Fostoria Police Department. After arriving at the trailer, Detective Bell located two spent shell casings on the ground just outside the front door. The officers secured a search warrant and located a Glock handgun with a loaded magazine on the front seat of the car that was sitting outside of the trailer.

**{¶9}** On February 23, 2022, Hartfield was indicted on one count of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a third-degree felony; one count of having weapons while under disability in violation of R.C. 2923.13(A)(3), a third-degree felony; one count of cocaine possession in violation of R.C. 2925.11(A), a second-degree felony; and

-4-

one count of endangering children in violation of R.C. 2919.22(A), a first-degree misdemeanor.

**{¶10}** On April 11, 2022, Hartfield filed a motion to suppress, arguing that he did not voluntarily consent for the deputies to enter the trailer. At a suppression hearing on August 16, 2022, Haudenshild, the four deputies who responded to the call, and Detective Bell testified. On October 5, 2022, the trial court denied the motion to suppress. On January 27, 2023, Hartfield entered a plea of no contest with a consent to a finding of guilt to all four charges in the indictment. The trial court accepted his pleas and issued a judgment entry of sentencing on March 9, 2023.

**{¶11}** Hartfield filed his notice of appeal on March 30, 2023. On appeal, he raises the following three assignments of error:

### First Assignment of Error

**Whether the trial court erred in denying Appellant's Motion to Suppress, where the trial court's factual conclusions were not supported by competent, credible evidence, and where the trial court incorrectly concluded that the entry by officers into Appellant's residence was lawful, that the search warrant was supported by probable cause, and that Appellant's statements to law enforcement were lawfully obtained.**

### Second Assignment of Error

**Whether the trial court's sentence, with respect to jail-time credit, was contrary to law, where the record showed that Appellant had been held in lieu of bond, in the instant case since his arrest, and where the evidence failed to show that Appellant had received credit for time served due to a 'holder' in Wood County.**

**Third Assignment of Error**

**Whether R.C. 2967.271, also known as the 'Reagan Tokes Act,' is unconstitutional under both the United States and Ohio Constitutions, where it improperly allows a non-judicial agency, the Ohio Department of Rehabilitation and Corrections, to unilaterally extend Appellant's sentence beyond the minimum prison term imposed by the trial court.**

*First Assignment of Error*

{¶12} Hartfield asserts that the trial court erred in denying his motion to suppress because he did not give voluntary consent for the deputies to enter the trailer.

Standard of Review

{¶13} On appeal, "motions to suppress present 'mixed questions of law and fact.'" *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 18, quoting *State v. Yeaples*, 180 Ohio App.3d 720, 2009-Ohio-184, 907 N.E.2d 333, ¶ 20 (3d Dist.).

> At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. [*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8]. *See also State v. Carter*, 72 Ohio St.3d 545, 552[, 1995-Ohio-104, 651 N.E.2d 965] (1995). When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19[, 437 N.E.2d 583] (1982).

*State v. Sidey*, 3d Dist. Allen No. 1-19-32, 2019-Ohio-5169, ¶ 8. "Accepting [the trial court's findings of] fact[] as true, the appellate court must then independently

Case No. 13-23-04

determine, without deference to the conclusion of the trial court, whether the facts

satisfy the applicable legal standard." *State v. James*, 2016-Ohio-7262, 71 N.E.3d

1257, ¶ 8 (3d Dist.), quoting *Burnside* at ¶ 8.

Legal Standard

**{¶14}** The Fourth Amendment to the United States Constitution "protects the

right of people to be free from unreasonable searches and seizures in their homes."

*James* at ¶ 9. "A warrantless search of a person's home is presumed unreasonable

unless an exception to the warrant requirement is shown." *State v. Reilly*, 3d Dist.

Seneca No. 13-19-28, 2020-Ohio-850, ¶ 11, quoting *State v. Yost*, 5th Dist. Perry

No. 18-CA-00024, 2019-Ohio-5446, ¶ 23. Searches that are conducted with consent

fall into a clearly delineated exception to the warrant requirement. *State v. Hale*,

2023-Ohio-980, 212 N.E.3d 32, ¶ 11 (3d Dist.).

> [W]here the validity of a search rests on consent, the State has the
> burden of proving that the necessary consent was obtained and that it
> was freely and voluntarily given, a burden that is not satisfied by
> showing a mere submission to a claim of lawful authority.

*State v. Wagner*, 3d Dist. Logan No. 8-20-06, 2020-Ohio-5574, ¶ 12, quoting

*Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

"Whether consent was freely and voluntarily given, or whether it was the product

of duress, coercion, or deception, is a question of fact to be determined from the

totality of the circumstances." *Hale*, *supra*, at ¶ 11.

> Factors to be considered in determining whether consent is voluntarily
> given include: (1) the suspect's custodial status and the length of the

detention; (2) whether consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (5) the suspect's awareness of his right to refuse consent and his status as a 'newcomer to the law'; and (6) the suspect's education and intelligence.

*Id*. at ¶ 12, quoting *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 23. However, while "a relevant factor to be taken into account,"

[k]nowledge of the right to refuse consent is not a prerequisite to establishing voluntary consent * * *. Consent to a search that is obtained by threats or force, or granted only in submission to a claim of lawful authority, is invalid.

*State v. Morris*, 2d Dist. Clark No. 2021-CA-31, 2022-Ohio-94, ¶ 21, quoting *State v. Sears*, 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, ¶ 37, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Legal Analysis

**{¶15}** Hartfield raises three main arguments to establish that the consent exception does not apply in this case. First, he asserts that, during his initial encounter with law enforcement, the officers engaged in a show of force that rendered his consent involuntary. In particular, Hartfield points to the fact that three of the four officers had their service weapons drawn in a "low, ready position" when they first approached the trailer. (Tr. 72).

**{¶16}** Deputy Decker Kneeskern testified that, in accordance with their training, several of the officers had their service weapons drawn since they were responding to a report that Hartfield had a gun and was behaving erratically. Deputy

Potter testified that his service weapon was holstered when he made contact with Hartfield. Deputy Cantu testified that he never had his service weapon pointed at Hartfield and that he holstered his sidearm before he conducted a pat-down of Hartfield's person. As soon as the pat-down was completed, the other two deputies holstered their service weapons.

**{¶17}** Deputy Potter then began to speak with Hartfield, describing the tone of this discussion as "conversational." (Tr. 42). He testified that no voices were raised and that Hartfield was compliant. (Tr. 42). Aside from the pat-down, no officer had placed a hand on Hartfield. Further, Hartfield had not been handcuffed or detained. Deputy Potter testified that he asked if they could continue speaking inside the trailer and that Hartfield said, "Yeah." (Tr. 41). *See State v. Wesley*, 7th Dist. Jefferson No. 15 JE 0006, 2017-Ohio-799, ¶ 10.

**{¶18}** Deputy Potter stated that Hartfield then "walked up the stairs, opened the front door, stepped inside, held the door open for me." (Tr. 41). *State v. Allen*, 11th Dist. Ashtabula No. 2017-A-0069, 2018-Ohio-3240, ¶ 25 ("Courts have found such actions as opening a door and stepping back, or leading an officer through an open door without expressing an intent that he should not follow constitute implied consent."), quoting *State v. Cooper*, 9th Dist. Summit No. 21494, 2003-Ohio-5161, ¶ 9. Deputy Potter also indicated that Hartfield never revoked his consent after they were inside.

**{¶19}** The testimony of the other officers who were present at the scene confirmed Deputy Potter's account of these events. Based on the evidence presented at the suppression hearing, the trial court concluded that

> the deputies holstered their weapons after the initial determination that the situation was safe and that Mr. Hartfield didn't have a weapon on his person. Based upon the nature of the call, which the deputies explained to Mr. Hartfield, it was not unreasonable for the deputies to appear with their weapons unholstered.

(Doc. 44). The trial court noted that Deputy Potter was outside when he asked if they could speak inside and that the deputies' service weapons were holstered at this time. The trial court found that "Hartfield was not under any duress when he replied in the affirmative and held the door open for [the] deputies to enter." *Id.* "Whether consent was freely and voluntarily given, or whether it was the product of duress, coercion, or deception, is a question of fact * * *." *Hale*, *supra*, at ¶ 12. Having reviewed the record, we conclude that the trial court's finding that Hartfield's consent was voluntary is supported by some competent, credible evidence. *Id.* at ¶ 10. Thus, we conclude his first argument is without merit.

**{¶20}** Second, Hartfield argues that he was not expressly informed by the officers that he had a right to refuse them entry into the trailer. Caselaw is clear that "[p]olice officers need not warn an individual of the right to refuse consent." *State v. Richardson*, 1st Dist. Hamilton No. C-200187, 2021-Ohio-2751, ¶ 21.

> Knowledge of the right to refuse consent is not a prerequisite to establishing voluntary consent, but is a relevant factor to be taken into account. Consent to a search that is obtained by threats or force, or

> granted only in submission to a claim of lawful authority, is invalid. [*Schneckloth, supra.*] Such 'lawful authority' is an express or implied false claim by police that they can immediately proceed to make the search in any event.

*Morris*, *supra*, at ¶ 21, quoting *Sears*, *supra*, at ¶ 35. While Hartfield was not expressly informed that he had a right to refuse consent, Deputy Potter expressly asked if they could speak inside the trailer. Since the record does not contain any evidence of threats, the use of force, or false claims of lawful authority, asking this question implicitly gave Hartfield the option to refuse. But in response, Hartfield not only gave verbal permission to the deputies but also undertook voluntary actions to facilitate their entry into the trailer. Thus, we conclude that his second argument is without merit.

**{¶21}** Third, Hartfield argues that his consent was involuntary since he was not behaving rationally during his interaction with the deputies. Deputy Potter testified that Hartfield was "paranoid about someone running around and knocking on doors." (Tr. 52). However, he denied that Hartfield appeared to be "in a state of psychosis[.]" (Tr. 51). Deputy Potter further stated that Hartfield was calm, was able to answer questions, did not raise his voice, and was cooperative. Further, when he was asked to show his hands and asked to submit to a pat-down, Hartfield was able to understand these requests and respond appropriately. After Deputy Potter asked to speak inside the trailer, Hartfield demonstrated he understood this request by walking to the door and facilitating the entry of the deputies. Hartfield's

actions consistently indicated that he understood what was being asked of him and that he had the ability to make decisions in response. Thus, we conclude that his third argument is without merit.[2]

**{¶22}** Beyond the issue of whether he gave valid consent, Hartfield also argues that the warrant that law enforcement obtained was not based on probable cause.

> The Fourth Amendment to the United States Constitution requires that warrants issue only 'upon probable cause.' Probable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of criminal activity is the standard of probable cause.' *State v. George*, 45 Ohio St.3d 325, 329[, 544 N.E.2d 640] (1989) (internal quotation marks omitted).

*State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31, 13-13-32, 2014-Ohio-557, ¶ 18.

> In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing [authority] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him * * *, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'

*State v. Craw*, 3d Dist. Mercer No. 10-17-09, 2018-Ohio-1769, ¶ 15, quoting *George* at paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

> Generally, 'neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause.' * * * 'In conducting any after-the-fact scrutiny of

---

[2] In his brief, Hartfield also argues that the exigent circumstances and protective sweep exceptions do not provide a basis for law enforcement to enter the trailer in this case. However, since the consent exception applies, we need not consider whether these other exceptions are applicable.

> an affidavit submitted in support of a search warrant, * * * appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.' * * *

*State v. Harrison*, 3d Dist. Logan No. 8-22-34, 2023-Ohio-1618, ¶ 14, quoting *George* at paragraph two of the syllabus. "In sum, on appeal, when we are reviewing the issuing judge's determination * * *, the review is limited to ensuring that the judge 'had a substantial basis for concluding that probable cause existed.'" *Gonzales* at ¶ 20, quoting *State v. Garza*, 2013-Ohio-5492, 5 N.E.3d 89, ¶ 19 (3d Dist.).

{¶23} In this case, law enforcement discovered what appeared to be a bag of cocaine that was sitting in plain view on the freezer in the kitchen.[3] The officers also located a handgun case that contained a loaded magazine but no firearm. Detective Bell also located two spent shell casings, which suggested that a firearm had been discharged in a residential area. Further, Haudenshild and her fiancé gave witness statements to the police. They reported hearing a gunshot and observing Hartfield walking around the yard with a handgun. Haudenshild had also reported seeing Hartfield getting in and out of the car parked outside of the trailer with a handgun. Based upon these reports and the items discovered, the judge had a substantial basis to conclude that sufficient probable cause existed to issue a search warrant in this case.

---

[3] In his brief, Hartfield asserts that the plain view doctrine does not apply to the cocaine and the handgun case because he did not give valid consent for the officers to enter the trailer and Deputy Breidenbach could not observe these items from a lawful position. However, since Hartfield gave valid consent, these items are subject to the plain view doctrine. *See State v. Holmes*, 2019-Ohio-2485, 139 N.E.3d 574, ¶ 46 (3d Dist.).

**{¶24}** In conclusion, the evidence in the record supports the trial court's determination that Hartfield gave valid consent for the deputies to enter the trailer. The officers then discovered several items in plain view that provided them with probable cause to obtain a search warrant. Thus, the trial court did not err in denying the motion to suppress. The first assignment of error is overruled.

*Second Assignment of Error*

**{¶25}** Hartfield argues that the trial court improperly calculated the amount of jail-time credit that he received at sentencing.

Legal Standard

**{¶26}** R.C. 2967.191 addresses the award of jail-time credit for prison terms and reads, in its relevant part, as follows:

> The department of rehabilitation and correction shall reduce the prison term of a prisoner, as described in division (B) of this section, by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced, including confinement in lieu of bail while awaiting trial, * * * confinement while awaiting transportation to the place where the prisoner is to serve the prisoner's prison term * * *.

"While the wording of this provision is directed at the Ohio Department of Rehabilitation and Correction, the trial court is to determine 'the number of days of confinement that a defendant is entitled to have credited toward his sentence.'" *State v. Cunningham*, 3d Dist. Marion No. 9-20-45, 2021-Ohio-1861, ¶ 6, quoting *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 98 Ohio St.3d 476, 2003-Ohio-2061, 786 N.E.2d 1286, ¶ 7.

Legal Analysis

**{¶27}** In his merit brief, Hartfield argued that the trial court failed to give him jail-time credit for the period of time between when his bond was set on February 28, 2022 and when he was sentenced on March 9, 2023. However, in its brief, the State pointed out that the record indicates that Hartfield posted bond on April 12, 2022. In response, Hartfield acknowledged in his reply brief that the record does establish that he posted bond on April 12, 2022. He then conceded that he would have only earned jail-time credit for the period going "from the date of his arrest through the date his bond was posted." (Reply Brief, 8). Given the number of days of credit that Hartfield received at sentencing, these identified dates are the apparent basis of the trial court's jail-time credit calculations.

**{¶28}** In conclusion, Hartfield concedes and the record establishes that he posted bond on April 12, 2022. For these reasons, he has not established that he is entitled to jail-time credit for the period between April 12, 2022 and March 9, 2023. Thus, Hartfield has failed to demonstrate that the trial court erred as initially alleged in his merit brief. His second assignment of error is overruled.

*Third Assignment of Error*

**{¶29}** Hartfield challenges the constitutionality of the Reagan Tokes Law, arguing that it violates the doctrine of the separation of powers.

Legal Standard

**{¶30}** Statutes enacted by the General Assembly are afforded a strong presumption of constitutionality. *State v. Ritchey*, 2016-Ohio-2878, 64 N.E.3d 599, ¶ 10 (3d Dist.). For this reason, the party challenging a statute must establish that the identified provision is unconstitutional beyond a reasonable doubt. *Id.*

> The separation-of-powers doctrine is 'implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government.' [*City of*] *S. Euclid v. Jemison*, 28 Ohio St.3d 157, 159, 503 N.E.2d 136 (1986). The doctrine 'requires that each branch of a government be permitted to exercise its constitutional duties without interference from the other two branches of government.' *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 56.

*State v. Hacker*, --- Ohio St.3d ---, 2023-Ohio-2535, --- N.E.3d ---, ¶ 11.

> The boundary line between them [the branches] is undefined, and often difficult to determine." *State ex rel. Atty. Gen. v. Peters*, 43 Ohio St. 629, 647, 4 N.E. 81 (1885). But the boundaries of each branch's power have been described in cases throughout the years. Relevant here is the principle that the legislative branch 'define[s] crimes,' 'fixes the penalty,' and 'provide[s] such discipline and regulations for prisoners, not in conflict with the fundamental law, as the legislature deems best.' *Id.*

*Id.* at ¶ 15. In turn, "[t]he judicial branch determines whether a person is guilty of an offense and, after a finding of guilt, imposes a prison sentence within the bounds established by the legislature." *Id.*

Legal Analysis

**{¶31}** On July 18, 2023, Hartfield filed his appellate brief. On July 26, 2023, the Ohio Supreme Court issued a decision in *State v. Hacker* that addressed the exact challenge raised herein, "hold[ing] that the Reagan Tokes Law does not violate the separation-of-powers doctrine." *Hacker* at ¶ 25. Following *Hacker*, we conclude that Hartfield's arguments challenging the constitutionality of Reagan Tokes Law are without merit. The third assignment of error is overruled.

*Conclusion*

**{¶32}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Seneca County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**/hls**