[Cite as *State v. Peeks*, 2021-Ohio-3045.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | No. 20AP-191 |
| | | (C.P.C. No. 18CR-1387) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Halbert Peeks, | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on September 2, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Michael P. Walton*, for appellant. **Argued:** *Michael P. Walton*.

**On brief:** *Jeremy Dodgion*, for appellee. **Argued:** *Jeremy Dodgion*.

APPEAL from the Franklin County Court of Common Pleas

BROGAN, J.

{¶ 1} Defendant-appellee, Halbert Peeks, was charged with two first-degree felonies of possessing and trafficking in cocaine which equaled or exceeded 100 grams.

{¶ 2} Peeks moved to suppress drugs discovered by police after they stopped his vehicle and patted him down outside the vehicle.

{¶ 3} At the hearing, State of Ohio, plaintiff-appellant, presented the testimony of Dustin Willis, a police officer with the city of Whitehall. Willis testified he was on patrol duty at approximately 2:00 a.m. on October 12, 2017, when he observed Peeks' vehicle. He testified as follows:

> I was traveling north on Robinwood Avenue. As I was traveling north, I could see East Broad Street. I observed a white Impala traveling east on East Broad Street. As it passed through the

> intersection and continued eastbound, I visually estimated a speed that was greater than the posted speed limit of 35 miles per hour.
>
> At which point I turned east on East Broad Street, and I observed a white Impala passing a vehicle. The vehicle that was being passed was in the center through lane, so the white Impala was in the curb lane. After completing passing the vehicle, he returned to the center through lane where I observed his vehicle weaving in its lane of travel and going left and right of the marked lane lines.

(Mar. 20, 2019 Tr. at 14-15.)

{¶ 4} Willis testified he was 900-1000 feet behind Peeks' vehicle when he observed the vehicle going left and right of the marked lane lines, and this was after Peeks' vehicle passed the vehicle in front of him. Willis testified these violations would have occurred directly before the video and maybe during the video as well.

{¶ 5} Willis testified he activated his lights at East Broad Street and Yearling Road. Willis described what he observed as he caught up with Peeks' vehicle at the intersection:

> As I was catching up to the defendant, I noticed the signal for East Broad Street and Yearling Road turned to red. He came to a very abrupt stop. From what it appeared to me, he almost rear-ended the vehicle in front of him.
>
> As I approached, the signal then changed to green. The vehicle did not immediately go. It was a few seconds, then it accelerated rapidly and veered to the left, at which point I activated my lights to initiate the traffic stop.
>
> Q. What happened after you activated your lights?
>
> A. The defendant turned his turn signal on, but did not stop. He continued driving, did get in the curb lane. I activated my siren several times, but we continued driving eastbound.
>
> Q. Let me back up. When you arrived at the intersection, which lane was the defendant's vehicle in?
> A. The defendant was in the center through lane.
>
> Q. As you enter and go through the intersection when the light changes and you hit your lights, which lane is he in?
>
> A. He changed to the curb lane.

Q. Did he do that before or after you activated your lights on your cruiser?

A. That was after I activated my lights.

Q. What did you observe about the length of time that it took him to bring his vehicle to a stop?

A. It was longer than normal.

Q. And describe that. What do you mean by "longer than normal"? What do you base that on?

A. If I base it on my experience of making traffic stops with each and every day that I'm on patrol, in this situation it took the defendant much longer than any normal traffic stop would have taken for the defendant to pull over.

Q. I'm not going to ask you to estimate how long it took, because we can see that once we watch the video, but in your training and experience, is there anything significant about a vehicle that takes its time coming to a stop when you're making a traffic stop?

A. There's usually something occurring inside the vehicle. In my training and experience, it's concealing narcotics, concealing contraband or a weapon, possibly arming themselves.

Q. This occurred at night, right? It was late or early morning, I guess?

A. Yes.
Q. Were you able to see in the rear window of his window at all during the time that you were trying to get him to pull over?

A. I could not.

Q. Okay. So you don't have any visual observation of him doing anything in particular, though?

A. No.

(Tr. at 22-25.)

{¶ 6} Willis testified that Peeks eventually stopped his vehicle and Willis made contact with him. Willis stated he received information about the registration on Peeks' vehicle just before or after he made the stop. Willis testified he activated his lights and, after

he informed his sergeant he was making the stop, his sergeant informed him that the registered owner had a drug offense suspension on his license (not a current one). Willis testified as follows:

A. When I made contact at the vehicle, the defendant was staring straightforward. I asked him if he was intoxicated, because at that point, I could already smell or detect the odor of an alcoholic beverage. During my initial questions, he responded slowly and with slurred speech. And I was able to see that his eyes appeared to be glassy.

When I asked for his driver's license, his motor skills appeared to be impaired. There were clumsy movements, but also rigid.

Q. Describe that or give us a little more detail about that. What was significant to you about that?

A. It was significant that he would not look at me. In my training and experience, that typically indicates deception. And based on his motor skills, it appeared that he was impaired, coupled with the odor of alcoholic beverage, but also his muscles appeared to be tensed.

Q. How would you describe his appearance? He wasn't relaxed, obviously?

A. No.

Q. Did he appear nervous? Did he appear worried? What came across to you?

A. He appeared more nervous than the normal citizen during a traffic stop.

Q. And what transpired after that, after your initial contact?

A. I asked him to exit the vehicle.

Q. And what was your reasoning? Why did you want him to exit the vehicle at that point?

A. I was concerned that there was a weapon either on him or in the car or some other contraband due to the length of time that it took him to stop. I also did intend to do field sobriety tests, so I was going to have him exit the vehicle so I could conduct an investigation.

Q. Now, at some point, did you have any kind of backup or any other officers arrive on the scene?

A. Yes.

Q. Who else came on the scene?

A. Officer Biggs, Officer Adams and Sergeant Wilder.

Q. And were they -- well, describe how things went as you were trying to get him out of the vehicle. What did you notice?

A. I noticed that he appeared to be very tense.

Q. Go ahead. I'm sorry.

A. So I maintained control at least on his arm.

Q. You had a hand on him?

A. Yes.

Q. Okay. Did you pat him down for anything?

A. I did. I conducted a patdown for weapons.

Q. And what did you observe as a result of your patdown?

A. During the patdown, I felt what appeared to be a sock with a hard rock-like substance in it in the front of his waistband.

Q. And just walk us through what happened then.

A. I believed it was drugs at that point. So I attempted to remove it from his pants, but I was not successful. At that point, I placed him in handcuffs and then I was able to remove it and identify it as drugs.

THE COURT: What made you think it was drugs?

[A.] Due to my knowledge, training and experience.

(Tr. at 27-30.)

{¶ 7}   Willis testified what it felt like in light of his experience was a huge chunk of cocaine. He stated the hard rock was inside a sock which he removed and it appeared to be crack cocaine. Willis stated as they were walking to his cruiser, another bag of cocaine fell

out of Peeks' pants. Willis said he then arrested Peeks and transported him to the police department. Willis stated he did not complete any field sobriety tests on Peeks because of the nature of the arrest on more serious charges. Willis testified he discovers crack cocaine in about 20 stops a year. The court asked Willis why he decided to frisk Peeks. Willis stated it was Peeks' behavior, the (previous) drug-related license suspension, his experience that there are usually weapons involved in trafficking drugs or possession of drugs, and the delay of Peeks in stopping his vehicle.

{¶ 8} The video from Willis' cruiser was then played for the court. The court asked Willis if the video depicted Peeks' vehicle veer to the right and Willis admitted the video did not show that. Willis also testified the initial violations he observed of Peeks' driving occurred before the video kicked on.

{¶ 9} On cross-examination, Willis stated he had previously been assigned on a temporary basis to the narcotics bureau of the Whitehall police department. Willis admitted the alleged speeding was not depicted on the cruiser video. Willis admitted that the video did not depict Peeks' vehicle cross over the white line and does not show Peeks abruptly stop or almost collide with the vehicle in front of him.

{¶ 10} Willis did not remember whether he received the prior suspension information before he initiated his cruiser lights.

{¶ 11} Willis was asked whether Peeks could have easily thought initially that Willis was trying to get around him when he "lit him up" in the left-hand lane. (Tr. at 57.) Willis answered "[i]nitially." (Tr. at 57.) Willis testified as follows under cross-examination:

> Q. Because you were maneuvering to get behind my client, correct?
>
> A. Correct.
>
> Q. In fact, there was a car directly behind the Impala, and you had to kind of maneuver in between the two, correct?
>
> A. Correct.
>
> Q. So you immediately get behind my client and flip on your lights because there's a car in front of him, too, correct?
>
> A. Correct.

Q. You're making a big deal because of the fact that he was delayed in pulling over when you had to hit your siren a couple of times, right?

A. Yes.

Q. But he could have easily thought because you immediately got in the left-hand lane that you were attempting to get around him to pursue somebody in front of him. That's a possible and honest interpretation?

A. I don't know what he's thinking.

Q. Correct. You've assumed and you assumed in your report that he was trying to avoid pulling over?

(Tr. at 58-59.)

{¶ 12} The court intervened and suggested that defense counsel rephrase the question. The court noted that his view of the video indicated that after Willis "li[t] him up" and hit his siren a couple of times it took Peeks about 35 seconds to pull over. (Tr. at 59.)

{¶ 13} Willis then admitted it was possible that Peeks thought Willis was trying to get him to pull over to maneuver around him. He admitted that once pulled over, Peeks was able to respond precisely to the questions asked of him. He admitted Peeks provided his driver's license immediately on request. He admitted that within 30 seconds of stopping Peeks' vehicle he got Peeks out of his vehicle. Willis testified that Peeks was tense and clumsy before he got out of his vehicle.

{¶ 14} On cross-examination, Willis stated he was about 500 feet on Robinwood Avenue from Broad Street when he estimated that Peeks was traveling over the speed limit. He admitted he had no idea whether Peeks was in fact going over the speed limit. He also admitted he did not see Peeks do any furtive movements when he was driving behind Peeks' vehicle or after he stopped him. Willis admitted he grabbed Peeks' hand after he asked Peeks to place his hands out of the window until he had him secured in his cruiser. Willis further testified as follows:

Q. Okay. But again, you had him exit this vehicle with no observations of furtive movements, no indication that he's got a weapon. He denied drinking. There is no smell of drugs, marijuana, anything like that, right?

A. Not that I recall.

Q. You didn't indicate that in the police report, wouldn't you agree?

A. Yes.

Q. There's no sign of drug paraphernalia. There's no pipes. There's no roaches. There's no powder residue anywhere on him, correct?

A. Correct.

(Tr. at 75.)

{¶ 15} Willis testified he held Peeks' hand behind his back and walked him backwards to the trunk of Peeks' vehicle and immediately decided to do a pat down. During the pat down, Willis felt what appeared to be multiple chunks of a hard, rock-like substance in a sock which he found to be crack cocaine. Willis then testified he placed Peeks under arrest for possession of drugs.

{¶ 16} At the conclusion of the suppression hearing, the trial court granted Peeks' motion to suppress and the state appealed. This court remanded the matter to the trial court to make findings of fact and conclusions of law requested.

{¶ 17} The trial court made the following findings of facts requested:

1. The evidence does not support erratic driving of the Defendant other than weaving once within his lane. The Court discredits any other testimony concerning alleged other erratic driving of the Defendant.

2. The weaving did provide a basis to pull the Defendant over for a traffic violation.

3. The Defendant pulled over after being signaled to by the Officer within twenty-eight to thirty (28-30) seconds. This time to pull over was not unreasonable. The Defendant responded to the signal to pull over and pulled over safely. The Court discredits any testimony to the contrary.

4. The Defendant was driving on a public street in Whitehall, Ohio, which is not known as a high drug crime "street."

5. The Defendant denied drinking and the Officer claims the Defendant smelled of alcohol. The Court does credit the Officer's testimony as to the smell of alcohol.

6.　The Defendant responded appropriately to the Officer's request to provide his license and insurance. The Court discredits any testimony to the contrary.

7.　The Defendant was not acting "nervous, intense or clumsy" and the Court discredits testimony to the contrary.

8.　The Defendant's speech was not slurred and the Court discredits testimony to the contrary.

9.　The Defendant's alleged failure to make eye contact was insignificant and occurred only for a matter of seconds and the Court discredits any testimony to the contrary. The video shows the interaction between the officer and the Defendant.

10.　The Defendant did not exhibit any impaired motor skills and the Court discredits any testimony to the contrary.

11.　The Defendant was not slow to exit the vehicle and was not given the chance to exit the vehicle but rather was pulled from the vehicle by the Officer. The Court discredits any testimony to the contrary.

12.　The Officer testified the Defendant had "glassy" eyes and the Court credits this testimony but finds it insignificant because no testimony exists that "glassy" eyes are solely indicative of intoxication or impairment. The Officer has no idea how the Defendant's eyes normally appear.

13.　The Defendant made no furtive movement nor did the Defendant do anything to lead the Officer to believe the Defendant was armed or dangerous. The Court discredits any testimony to the contrary.

14.　The Defendant was under arrest and not free to leave when the Officer removed the Defendant from the car. (TR. 71) Thus, all information the Officer had up to that point in time would have to establish probable cause, if probable cause existed, for the arrest.

15.　The Defendant was not asked to perform any field sobriety tests and was not cited for driving while impaired and was not charged with any other traffic infraction.

16.　Prior to approaching the vehicle, the Officer knew the registered owner of the vehicle had an inactive driver's license suspension for some unknown "drug" offense. The

Court finds this insignificant in that it was old and not indicative years later that the Defendant might be in possession of drugs on the night of this traffic stop. Moreover, the Officer, at the time of approaching the vehicle and pulling the Defendant out, was unaware of whether the driver, the Defendant, was the registered owner of the vehicle who was the person who had the previous old "drug" suspension. (TR. 70, 85-86)

17. In summary, the Court finds that the Officer smelled an odor of alcohol on the Defendant, the Defendant had "glassy" eyes, and that he failed to make eye contact for a few seconds. The Court finds the Defendant did weave once in his lane. The Court discredits all other testimony regarding the Defendant's alleged impairment and alleged erratic driving.

The Court balances the findings that the Defendant had an odor of alcohol, "glassy" eyes, and weaved once within his lane with the following findings indicating the Defendant was not impaired and that probable cause did not exist to arrest him for O.V.I.

1. The Defendant's alleged erratic driving was a single instance of weaving within his lane of travel (TR. 13, 55)

2. The Defendant immediately produced his valid license upon request of the Officer. (TR. 63)

3. The Defendant did not stagger, stumble, fall over or otherwise indicate his motor skills were impaired. (TR. 65)

4. The Defendant made no furtive movements inside the vehicle. (TR. 69-70 lines 1-6)

5. The Defendant obeyed the Officer's instructions once the Officer was at the window of the Defendant's car. (TR. 70)

6. The Defendant was not belligerent and "gave the Officer no problems." (TR. 70)

7. There was no smell of marijuana or any proof of drug usage. (TR. 75)

8. When the Officer pulled the Defendant over, the Defendant signaled a lane change and safely pulled over. (TR. 60)

(Mar. 26, 2020 Jgmt. at 1-4.) The trial court then made the following conclusions of law in suppressing the drugs found on Peeks at the time of his arrest:

1. The Defendant's minor weaving offense gave the Officer probable cause to pull the Defendant over for this violation.

2. The other signs credited by the Court odor of alcohol, "glassy" eyes, and seconds of no eye contact gave the Officer reasonable suspicion to order the Defendant out of the vehicle to investigate further for O.V.I. and to request that the Defendant perform field sobriety tests. The Defendant did not exhibit any other behavior of impairment that would provide probable cause to arrest the Defendant for driving while impaired.

3. The Officer did not perform field tests and arrested the Defendant immediately for O.V.I. when he removed the Defendant from the car. The reasonable suspicion existing to request that the Defendant perform field tests did not permit the Officer to frisk or search the Defendant. The Defendant had done nothing to indicate he was armed or dangerous.

4. Finally, in balancing the facts indicating the Defendant was not impaired with the Court's other findings, the totality of the circumstances establish the Officer lacked probable cause to arrest the Defendant for O.V.I. Thus, the search of the Defendant was not a search incident to arrest. The Prosecutor failed to establish by a preponderance of the evidence that either of the two exceptions to the warrant requirement and thus, the search of the Defendant was unlawful and violated the Fourth Amendment.

(Footnote omitted.) (Mar. 26, 2020 Jgmt. at 5-6.)

{¶ 18} Appellate review of a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *See State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). The appellate court must decide questions of law de novo, without deference to the trial court's legal conclusions. *Burnside* at ¶ 8.

{¶ 19} The state's first assignment of error is that the trial court erred when it failed to account for the totality of the circumstances established by the evidence in deciding whether there was probable cause to arrest and reasonable suspicion to conduct a pat-down

search. The state's third assignment is identical to its first. In its second assignment of error, the state contends the trial court erred when it required evidence of impairment to support probable cause for driving while impaired.  In the last assignment, the state argues the trial court erred in suppressing the evidence without making a finding that there was a culpable violation of the Fourth Amendment.

{¶ 20} The "stop and frisk" exception to the warrant requirement of the Fourth Amendment was created by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).

{¶ 21}  In *Terry*, police observed that Terry and his two companions appeared to be casing a business to commit an armed robbery. A police officer approached the men and asked for their names. When the men only gave a mumbled response, the officer grabbed Terry, spun him around, and patted down his outer clothing, revealing a revolver. The officer patted down the other men and found a second weapon. The officers arrested the men and charged them with carrying concealed weapons.  In upholding the officer's actions, the court provided detailed guidance regarding police citizen street encounters. Chief Justice Warren wrote on behalf of the court:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, *and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety,  he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him*.  Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

(Emphasis added.) *Terry* at 30-31.

{¶ 22} The Supreme Court of Ohio has reiterated that a frisk for weapons must be supported by articulable facts and circumstances giving rise to reasonable fear for the officer's safety. *State v. Evans*, 67 Ohio St.3d 405, 408 (1993), citing *Terry* at 21-24.

{¶ 23}  There was no basis for Willis to pat down Peeks' outer clothing which revealed the presence of the crack cocaine. Willis testified he did not see Peeks make any furtive movements before he stopped his vehicle or after he stopped him. Willis was asked by defense counsel whether in his personal encounter with Peeks at the vehicle he saw any indication that Peeks had a weapon. Willis responded "[n]ot that I recall." (Tr. at 75.) Willis testified that as soon as he had Peeks out of his vehicle and at the rear of the vehicle, he immediately decided to do a pat down. In his findings of fact, the trial judge specifically found from viewing the video that Peeks made no further movement nor did he do anything to lead Willis to believe he was armed and dangerous. The court discredited testimony to the contrary. The trial court found Peeks was not belligerent and "gave the officer no problems." (Conclusions of Law 6, citing Tr. at 70.) Lastly, the trial judge noted that Peeks was driving on a street not known as a high crime "street." (Findings of Fact 4.) The trial judge in his conclusions of law found that the reasonable suspicion existing to request that Peeks perform field sobriety tests did not permit Willis to frisk or search him. The court stated Peeks had done nothing to indicate he was armed or dangerous.

{¶ 24}  Peeks was not arrested for driving while being impaired because the evidence did not support probable cause to do so. No field sobriety tests were performed because Willis found the drugs and decided to arrest Peeks for the drug charge only. The state's first three assignments of error are accordingly overruled.

{¶ 25}  In the fourth assignment, the state contends that Officer Willis acted in good faith in conducting the pat-down search of Peeks. The state argues the United States Supreme Court recognized the good-faith exception in warrantless cases. The state cites *Illinois v. Krull*, 480 U.S. 340 (1987), in support of that proposition. However, in that case, the Supreme Court held that the exclusionary rule did not apply to evidence obtained by police who acted in objectively reasonable reliance on a "statute" authorizing warrantless administrative searches but which statute was subsequently found to violate the Fourth Amendment. *Id.* at 360.

{¶ 26}  In *State v. Thomas*, 10th Dist. No. 14AP-185, 2015-Ohio-1778, this court distinguishes the good-faith exception recognized in *Herring v. United States*, 555 U.S. 135 (2009), where the mistake was made by a county clerk that a warrant existed for the defendant's arrest. Judge Brown wrote:

> As noted by one federal court, however, "[t]he Supreme Court has never applied the good faith exception to excuse an officer

who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights." *United States v. Camou*, 773 F.3d 932, 945 (9th Cir.2014). Further, as one commentator has observed, "the prevailing view of the lower courts is that a 'good faith' exception to the exclusionary rule does not apply in situations in which a police officer relies upon his *own* judgment to conduct a warrantless search or arrest." (Emphasis sic.) 2-11 Criminal Constitutional Law, Section 22.02(1)(d)(iv) (2014). In this respect, "[w]here there is no outside authority on which the officer reasonably relied, the principal rationale relied upon by the Supreme Court in [*United States v. Leon*, 468 U.S. 897 (1984)] and its progeny—that it would serve no deterrent purpose to punish the officer, acting in good faith, for the error of the magistrate, the legislature, or by a negligent mistake by a court or police employee—is not present." *Id.* Therefore, "evidence obtained during a warrantless search by a police officer must be excluded from the prosecution's case-in-chief when the search subsequently is held unreasonable under the Fourth Amendment, even though the officer acted with the objectively reasonable belief that the search was constitutionally valid." *Id.*

*Id.* at ¶ 45.

{¶ 27} The state's citation to the recent Supreme Court of Ohio decision in *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, is not helpful to its position. In that case, like in others before it, police relied on a warrant to conduct a search. The issue before the *Dibble* court was whether that reliance was made in good faith and, more specifically, whether a court may consider evidence beyond the four corners of a search warrant affidavit in making that determination. Considering this case involves a warrantless search, *Dibble* is distinguishable and does not demand reversal based on the good-faith exception here.

{¶ 28} The Ninth District Court of Appeals refused to apply the good-faith exception where police mistakenly entered the defendant's apartment. *See State v. Simon*, 119 Ohio App.3d 484 (9th Dist.1997).

{¶ 29} In *State v. Dickman*, 10th Dist. No. 14AP-597, 2015-Ohio-1915, this court refused to apply the good-faith exception to evidence recovered after an illegal arrest. Judge Brunner cited the words of Justice Stewart in *Beck v. Ohio*, 379 U.S. 89 (1964). "If subjective good faith created an exception to the exclusionary rule, enforcement of the Fourth Amendment for people to be ' "secure in their persons, houses, papers, and effects," ' would [only] be at the discretion of the police." *Dickman* at ¶ 27, quoting *Beck* at 97, quoting

Fourth Amendment to the U.S. Constitution. The state's fourth assignment of error is likewise overruled.

{¶ 30} Accordingly, the state's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.

BROGAN, J., retired, of the Second Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).

_____