[Cite as *State v. Barnes*, 2024-Ohio-5865.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLANT,

  v.

DAVID HALE BARNES,

    DEFENDANT-APPELLEE.

CASE NO. 6-24-03

O P I N I O N

---

**Appeal from Hardin County Common Pleas Court**
**Trial Court No. CRI20232164**

**Judgment Affirmed**

**Date of Decision:  December 16, 2024**

---

**APPEARANCES:**

    *Morgan S. Fish* **for Appellant**

**WILLAMOWSKI, P.J.**

{¶1} The State of Ohio appeals the judgment of the Hardin County Court of Common Pleas, arguing that the trial court erred by granting the motion to suppress filed by defendant-appellee David H. Barnes ("Barnes"). For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} On June 10, 2023, Patrolman Lucas Risner ("Patrolman Risner") was parked in the vicinity of Barnes's house. On prior dates, law enforcement had received reports of suspicious activities transpiring at Barnes's residence and had responded to drug overdoses at that location. For these reasons, the police believed that the house where he lived was the site of drug-related activities. Around 2:00 P.M., Patrolman Risner saw Barnes leave his house in a pickup truck and observed him make at least three turns without properly activating his turn signal.

{¶3} Because he "believed that it could potentially become a narcotics investigation," Patrolman Risner contacted the handler in a canine unit, Officer Melvin Yoder ("Officer Yoder"), to determine whether a drug-detection dog was available. (Tr. 143). In response, Officer Yoder got his canine partner and headed towards Patrolman Risner's location. After initiating a traffic stop, Patrolman Risner approached the pickup truck. Barnes was the driver while Ginger Williams ("Williams") and Charles Wilcox ("Wilcox") were passengers. Patrolman Risner

obtained Barnes's driver's license and gave this information to dispatch for a records search.

{¶4} Officer Yoder arrived at the scene roughly ten minutes after the traffic stop had been initiated. By this point, dispatch had not yet provided Patrolman Risner with the information he had requested. The canine was deployed to examine Barnes's vehicle and alerted after walking to the middle of the passenger side of the pickup truck. At this point, the three occupants of the vehicle were directed to exit the vehicle.

{¶5} After Barnes exited the truck, Officer Yoder performed a pat-down search of Barnes's person but did not locate any weapons. Officer Yoder then began to search the driver's side of the vehicle. Since Patrolman Risner was standing on the passenger side of the vehicle, he engaged Wilcox and Williams after they exited the pickup truck. He directed Williams to "empty out [her] * * * pockets" and "shake out * * *[her] bra." (Ex. 5). He later explained that he gave this directive because "[i]t is very common for women to hide contraband in their bra." (Tr. 115).

{¶6} At this time, Barnes was walking towards where Wilcox was located besides the police cruiser. Patrolman Risner approached Barnes and stated, "Did he already—here, I'm going to double check." (Ex. 5). Patrolman Risner then reached into one of Barnes's pockets and pulled out a cellular phone. After Barnes told him to stop, Patrolman Risner reached into this pocket again and retrieved an old film

canister. The canister was opened and found to contain what appeared to be methamphetamines.

**{¶7}** Officer Yoder had stopped searching the vehicle when he heard Patrolman Risner speaking to Barnes about the contents of his pockets. When the police indicated that they were going to resume the search of the pickup truck, Williams stated that her purse was inside the vehicle and contained a drug pipe and a syringe. After the police located these items in her purse, they discovered two other drug pipes inside the center console of the vehicle. Once the search of the vehicle was completed, the police officers decided not to arrest Barnes and permitted him to leave on his own accord.

**{¶8}** On September 14, 2023, Barnes was indicted on one count of aggravated possession of drugs in violation of R.C. 2925.11(C)(1)(a), a fifth-degree felony. On January 19, 2024, Barnes filed a motion to suppress. Patrolman Risner and Officer Yoder testified at the suppression hearing. Footage from Patrolman Risner's body camera was presented. On March 18, 2024, the trial court granted Barnes's motion to suppress, finding that the police did not have reasonable suspicion or probable cause to conduct the "second warrantless search of the defendant's person." (Doc. 46).

**{¶9}** The State filed its notice of appeal on March 21, 2024. On appeal, the State raises the following three assignments of error:

-4-

## First Assignment of Error

**The trial court improperly suppressed evidence because law enforcement does not need probable cause or reasonable suspicion to perform a canine search.**

## Second Assignment of Error

**The trial court improperly suppressed evidence because law enforcement had reasonable suspicion to perform a second pat-down of the Defendant and the contraband was evident under a plain error standard.**

## Third Assignment of Error

**The trial court improperly suppressed evidence because law enforcement would have inevitably discovered the evidence through a search incident to a lawful arrest.**

We will consider the arguments raised in the second and third assignments of error before proceeding to those raised in the first assignment of error.

### Second Assignment of Error

{¶10} The State of Ohio argues that Patrolman Risner had reasonable suspicion to search Barnes's pockets after Officer Yoder had already conducted a pat-down of Barnes's outer clothing for weapons.

#### Standard of Review

{¶11} On appeal, "motions to suppress present 'mixed questions of law and fact.'" *State v. Kerr*, 2017-Ohio-8516, ¶ 18 (3d Dist.), quoting *State v. Yeaples*, 2009-Ohio-184, ¶ 20 (3d Dist.).

> At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and

> the credibility of witnesses. [*State v. Burnside*, 2003-Ohio-5372, ¶ 8].
> * * * When reviewing a ruling on a motion to suppress, deference is
> given to the trial court's findings of fact so long as they are supported
> by competent, credible evidence. *Burnside* at ¶ 8 * * *.

(Citations omitted.) *State v. Harpel*, 2020-Ohio-4513, ¶ 16 (3d Dist.), quoting *State v. Sidney*, 2019-Ohio-5169, ¶ 8 (3d Dist.). "Accepting [the trial court's findings of] fact[] as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Bracketed text in original.) *State v. Ferguson*, 2024-Ohio-1239, ¶ 12 (3d Dist.), quoting *Burnside* at ¶ 8.

Legal Standard

**{¶12}** The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." U.S. Const., Amend. IV. "The Ohio Constitution offers a parallel provision to the Fourth Amendment * * * that has been held to afford the same level of protection as the United States Constitution." *Kerr* at ¶ 12. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Thus, '[t]he touchstone of the Fourth Amendment is reasonableness.'" *Kerr* at ¶ 12, quoting *Jimeno* at 250.

**{¶13}** A search within the meaning of the Fourth Amendment "occurs when there is a 'physical intrusion of a constitutionally protected area'" or "an official

intrusion into a sphere in which there exists a reasonable expectation of privacy * * *." *State v. Jackson*, 2022-Ohio-4365, ¶ 15, quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983). A warrantless search by law enforcement is unreasonable unless a well-delineated exception to this general rule is applicable. *State v. Burroughs*, 2022-Ohio-2146, ¶ 13. The Ohio Supreme Court has recognized seven exceptions to the general rule requiring search warrants:

    (a) a search incident to a lawful arrest;

    (b) consent signifying waiver of constitutional rights;

    (c) the stop-and-frisk doctrine;

    (d) hot pursuit;

    (e) probable cause to search, and the presence of exigent circumstances;

    (f) the plain view doctrine; and

    (g) administrative search

*State v. Urdiales*, 2015-Ohio-3632, ¶ 28 (3d Dist.), quoting *State v. City of Stow*, 64 Ohio St.3d 156, fn. 4 (1992).

{¶14} The "stop-and-frisk doctrine" originates in *Terry v. Ohio*, 392 U.S. 1 (1968). This exception "permits a police officer to 'stop or detain an individual without probable cause when the officer has a reasonable suspicion * * * that criminal activity is afoot.'" *State v. Pinckney*, 2015-Ohio-3899, ¶ 18 (10th Dist.), quoting *State v. Jones*, 2010-Ohio-2854, ¶ 16 (10th Dist.). In this process, the police

officer may "conduct a carefully limited search of the outer clothing" of the stopped individual "in an attempt to discover weapons." *Terry* at 30. However,

> a limited protective search of the detainee's person for concealed weapons is justified only when the officer has reasonably concluded that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others * * *.' [*Terry* at 24.] * * * 'Where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others.' *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph two of the syllabus.

(Brackets sic.) *State v. Walker*, 2024-Ohio-303, ¶ 7 (1st Dist.), quoting *State v. Evans*, 67 Ohio St.3d 405, 408-409, 618 N.E.2d 162 (1993).

> "Reasonable suspicion entails some minimal level of objective justification * * * that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause."

*Harpel*, 2020-Ohio-4513, ¶ 13, quoting *State v. Jones*, 70 Ohio App.3d 554, 556-557 (2d Dist. 1990). As a general matter, a police "officer's right to frisk an individual is virtually automatic when the person is suspected of a crime, such as drug trafficking, where the individual is likely to be armed." *State v. Minyoung*, 2012-Ohio-411, ¶ 17 (3d Dist.), citing *Evans* at 408.

{¶15} Importantly, "[t]he purpose of this [type of] limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Adams v. Williams*, 407 U.S. 143, 146 (1972). For this reason, "a *Terry* search must 'be confined in scope to an intrusion reasonably

designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.'" *State v. Nolen*, 2020-Ohio-118, ¶ 35 (4th Dist.), quoting *Terry* at 29.

**{¶16}** However, if a police officer is conducting a lawful weapons pat down and detects an object that has features making its criminal character "immediately apparent," the contraband may be seized without a warrant pursuant to the plain feel doctrine. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). The rationale underlying this doctrine is that the detection of such contraband involved "no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons * * *." *Id*.

**{¶17}** "A second-pat down search has been found to be justified when the officer who conducted the second pat-down search did not observe the first pat down or was concerned with the adequacy of the first pat down." *State v. Garrett*, 2018-Ohio-4530, ¶ 56 (2d Dist.). "The rationale for a protective search, however, becomes attenuated with successive searches." *State v. Hackett*, 2007-Ohio-1868, ¶ 16 (6th Dist.). "Police are not entitled to 'unlimited bites of the apple.'" *Id*., quoting *United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005). "When the use of multiple protective searches exceeds the rationale behind a *Terry*-type investigation, it becomes unreasonable." *Hackett* at ¶ 17.

**{¶18}** "To deter Fourth Amendment violations, the Supreme Court of the United States has adopted an exclusionary rule under which 'any evidence that is

obtained during an unlawful search or seizure will be excluded from being used against the defendant.'" *Kerr* at ¶ 17, quoting *State v. Steinbrunner*, 2012-Ohio-2358, ¶ 12 (3d Dist.). "At a suppression hearing, the State bears the burden of establishing that a warrantless search and seizure falls within one of the exceptions to the warrant requirement, and that it meets Fourth Amendment standards of reasonableness." *Steinbrunner* at ¶ 12. Where a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. 366, at 373.

Legal Analysis

**{¶19}** The State argues that trial court erred in concluding that Patrolman Risner did not have sufficient legal justification to search Barnes's pockets after Officer Yoder had already conducted a pat-down search of Barnes's outer clothing. In this case, Officer Yoder testified that he conducted a limited, pat-down search for the purpose of determining whether Barnes was armed. Officer Yoder stated he did not detect any item "large enough to be a significant danger" and affirmed that he was "satisfied that he [Barnes] was not packing a gun or other weapon." (Tr. 53, 69).

**{¶20}** After this limited, pat-down search, Barnes moved towards the area where Wilcox was standing next to the police cruiser. Patrolman Risner testified that, as he was talking to Williams, he could see Wilcox and Barnes in his peripheral vision and "thought that there was a *possibility* that they could have handed

something off to one another." (Emphasis added.) (Tr. 116-117). However, in its judgment entry, the trial court noted that, in this timeframe, "Mr. Wilcox was visible on his [Patrolman Risner's] body cam off and on and clearly was not near the defendant most of the time." (Doc. 46).

**{¶21}** On cross-examination, Patrolman Risner admitted that the body camera footage contained no indication that any type of exchange occurred but stated that he "*felt* as if something could have taken place." (Emphasis added.) (Tr. 136). The following exchange then occurred:

> [Defense Counsel:] At no time do we see from the body cam any type of exchange occur, do we?
>
> [Patrolman Risner:] We don't see the exchange, no.
>
> [Defense Counsel:] And you didn't either, did you?
>
> [Patrolman Risner:] Out of my peripheral I *felt* as if something could have taken place.
>
> [Defense Counsel:] But you didn't see anything, did you?
>
> [Patrolman Risner:] No, I didn't see a handoff, no.
>
> [Defense Counsel:] Now why on the body cam, then, did you tell Mr. Barnes that you saw him put that in his pocket?
>
> [Patrolman Risner:] Because I believed that I did.
>
> [Defense Counsel:] Okay. But you didn't, did you?
>
> [Patrolman Risner:] No.
>
> * * *

> [Defense Counsel:] I mean, how do you believe you see something from what we just saw [on the body camera footage]?
>
> [Patrolman Risner:] *I can't explain to you how I felt at that moment.* I was busy dealing with her [Williams]. Out of my peripheral, it looked like something could have been potentially handed off so I investigated further and I was right.

(Emphasis added.) (Tr. 136-137). Patrolman Risner then went over Barnes and "asked him if he had already been patted down because [he] didn't know at that time if [Barnes] had been or not." (Tr. 117). He described Barnes's actions in response as follows:

> So his [Barnes's] behavior, you could tell in his voice that there was— he was kind of stuttering or whatnot, which led me to believe that there was some deceptive behavior behind that. He was fidgeting with his hands, still fidgeting with his pockets, pacing around, getting close to Charles [Wilcox], walking away. Just all over the place.

(Tr. 119-120). Patrolman Risner told Barnes that he was going to "double-check him." (Tr. 117, Ex. 5). In response, Barnes "got defensive." (Tr. 117). Patrolman Risner testified that he "made the decision to go in his [Barnes's] pocket" "based on his demeanor * * *." (Tr. 117).

{¶22} On appeal, the State argues that the stop-and-frisk exception applies to Patrolman Risner's search of Barnes's pockets. However, even if Patrolman Risner had been unaware of the prior pat-down of Barnes's person, he never mentioned any safety concerns as a reason for reaching into Barnes's pockets at the suppression hearing or on the recording from his body camera. *State v. Howard*,

-12-

2020-Ohio-1400, ¶ 25-27 (5th Dist.); *Toledo v. Powell*, 2014-Ohio-3627, ¶ 30 (6th Dist.).

**{¶23}** Rather, Patrolman Risner testified that he believed that a canine alert at a vehicle provided grounds to search the passengers[1] and that the exigent circumstances exception applied to the search of Barnes's person. This testimony is an indication that the search of Barnes's pockets was undertaken for the purpose of locating evidence rather than to ensure officer safety. In contrast, Officer Yoder's testimony regarding the earlier pat-down of Barnes's person clearly explained that he was searching for weapons to ensure officer safety before they proceeded to examine the vehicle.

**{¶24}** In evaluating this testimony, the trial court noted that Patrolman Risner mentioned a "possibility" of a handoff before "admit[ing] he did not see Mr. Wilcox hand anything to the defendant, but just had a feeling * * *" that he "c[ould]n't explain." (Doc. 46, quoting Tr. 117, 137). The trial court then noted that

> Officer Risner admitted that he did not see the defendant actually do anything, he just suspected it or 'had a feeling' that he could not explain. Based upon this feeling, which the Court would call an inarticulable hunch, he engaged in a second pat-down which produced a cell phone, pocketknife and small canister containing suspected methamphetamine.

---

[1] In the body camera footage, Patrolman Risner appeared to act consistently with this assertion in his interactions with Williams and Barnes. He ordered Williams to empty her pockets immediately after she exited the vehicle rather than perform a limited pat-down search of her person for weapons. He then told her to "shake out * * *[her] bra" because "[i]t is very common for women to hide contraband in their bra." (Ex. 5, Tr. 115). This testimony indicates that his examination of Williams was motivated by evidentiary considerations rather than safety concerns. After no contraband fell from Williams's pockets or bra, Patrolman Risner then walked over to Barnes and reached into his pockets.

(Doc. 46). Further, the trial court noted that Patrolman Risner did not testify "that he was fearful at the time of the second pat down * * *," and no other evidence in the record suggested he was conducting a protective search by reaching into Barnes's pockets. (Doc. 46). *State v. Peeks*, 2021-Ohio-3045, ¶ 22 (10th Dist.).

{¶25} Based on these observations, the trial court found that there was no "solid evidence of a 'particularized suspicion'" in this case and that "[o]fficer safety was not a consideration in the second pat-down/frisk." (Doc. 46). For these reasons, the trial court correctly concluded that "the stop and frisk doctrine * * * does not apply because the defendant had already been frisked and there was no evidence subsequent to that which would call into question officer safety." (*Id.*).

{¶26} Additionally, we also note that Patrolman Risner did not appear to be engaging in a limited pat-down search of Barnes's outer clothing in the body camera footage. Rather, he testified that he "made the decision to go in his [Barnes's] pocket." (Tr. 117). In the video footage, Patrolman Risner reached directly into Barnes's pockets almost immediately after approaching him. *State v. Debrossard*, 2015-Ohio-1054, ¶ 32 (4th Dist.).

{¶27} In summary, the State did not provide evidence that suggests that a concern for officer safety motivated the search of Barnes's pocket. Thus, we conclude that the State failed to establish that the stop-and-frisk doctrine was

applicable to the search of Barnes's pockets.[2]  Having examined the facts in the record before us, we conclude that the State has failed to demonstrate that the trial court erred in granting Barnes's motion to suppress with this argument. Accordingly, the second assignment of error is overruled.

*Third Assignment of Error*

**{¶28}** The State of Ohio argues that, even if Patrolman Risner's search of Barnes's pockets was not constitutionally permissible, the contraband would have been inevitably discovered as the result of the lawful search of the vehicle.

Legal Standard

**{¶29}** "A warrantless search of an automobile, where police officers have probable cause to believe such vehicle contains contraband, is one of the well-recognized exceptions to the constitutional requirement of a search warrant." *State v. Holmes*, 2019-Ohio-2485, ¶ 43 (3d Dist.), quoting *State v. James*, 2016-Ohio-7660, ¶ 23 (5th Dist.).  "If a trained canine alerts to the odor of drugs from a lawfully stopped and detained vehicle, an officer has probable cause to search the vehicle for contraband." *State v. Jennings*, 2015-Ohio-1750, ¶ 10 (2d Dist.).

**{¶30}** Further, under the inevitable-discovery doctrine, evidence that is obtained inconsistently with the requirements of the Fourth Amendment can still be

---

[2] In its response to the motion to suppress, the State argued that the exigent circumstances exception to the warrant requirement was applicable in addition to the stop-and-frisk doctrine.  However, since the State only raised arguments based upon the stop-and-frisk doctrine on appeal, we need not consider the applicability of other exceptions to the warrant requirement.

admissible if "the state establishes that the evidence would inevitably have been discovered in the course of a lawful investigation." *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 27. "The rule permits the State to remove the taint from ill-gotten evidence by establishing that the unlawful act from which the evidence resulted was 'not a sine qua non of its discovery.'" *State v. Barnes*, 2017-Ohio-7284, ¶ 12 (3d Dist.), quoting *U.S. v. Griffin*, 502 F.2d 959 (6th Cir. 1974).

**{¶31}** For this exception to the exclusionary rule to apply, the State must establish "(1) that the police possessed the leads making the discovery inevitable at the time of the misconduct and (2) that the police were actively pursuing an alternative line of investigation prior to the misconduct." *Barnes* at ¶ 12, quoting *State v. Keith*, 2008-Ohio-4326, ¶ 10 (2d Dist.). Thus, the State must demonstrate a "reasonable probability" exists "that the evidence would have been discovered apart from the unlawful conduct" by a preponderance of the evidence. *Banks-Harvey* at ¶ 27.

**{¶32}** Importantly, "[t]he state must prove not simply that the government *could have* found the evidence without the constitutional violation, but affirmatively *would have* found it." (Emphasis added.) *State v. Alihassan*, 2012-Ohio-825, ¶ 29 (10th Dist.). "Proof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.'" *Toledo v. Powell*, 2014-Ohio-3627, ¶ 31 (6th Dist.), quoting *Nix v. Williams*, 467 U.S. 431, 444-445, fn. 5 (1984).

Legal Analysis

**{¶33}** The State argues that, notwithstanding Patrolman Risner's search of Barnes's pockets, the illegal drugs would still have been inevitably discovered through a lawful line of investigation. The State points out that, after the canine alert gave the police probable cause to search the vehicle, Officer Yoder had begun a lawful search of the vehicle that was interrupted when Patrolman Risner discovered the contraband in Barnes's pocket. *Jennings* at ¶ 10. This evidence does indicate that law enforcement was engaged in an alternative line of investigation prior to the misconduct. *Keith* at ¶ 10.

**{¶34}** The State then traces this alternative line of investigation through three main steps that would have purportedly led to the inevitable discovery of the methamphetamines: (1) if Barnes's pockets had not been prematurely searched, the police *would have* continued searching the vehicle and discovered the drug paraphernalia; (2) on finding this evidence of a crime, the police *would have* arrested Barnes; and (3) the police *would have* discovered the illegal drugs in Barnes's pockets during a permissible search incident to this arrest.

**{¶35}** The first step is substantiated by the evidence before us: when the police returned to searching the vehicle, they located the drug paraphernalia. However, the second step is at odds with the "demonstrated historical facts" in the record because Barnes was never arrested. *Nix*, 467 U.S. 431, 444-445, fn. 5. The State asserts that, in the alternative line of investigation, the police would have

-17-

arrested Barnes for the misdemeanor offense of possession of drug paraphernalia after the drug pipes were discovered in the center console of the vehicle.

**{¶36}** But in this case, the police did locate the drug paraphernalia in the center console of the vehicle and did not arrest Barnes after its discovery. *See also State v. Coan*, 1999 WL 1299294, *4 (11th Dist. Dec. 3, 1999) (The State conceded that the police would not have inevitably discovered contraband in a vehicle during the course of an inventory search because the vehicle was never impounded.). Further, at the time the drug pipes were found, the police had reason to believe that Barnes had committed the felony offense of possession of drugs in addition to the misdemeanor offense of possession of drug paraphernalia. Yet the police still chose not to arrest Barnes. The State cannot persuasively argue that the police *would have* taken the opportunity to arrest Barnes for a misdemeanor offense in an alternative line of investigation when the police *did not* take the opportunity to arrest Barnes for a misdemeanor and a felony.

**{¶37}** Since the State has failed to establish that the police would have arrested Barnes for possession of drug paraphernalia, a search incident to an arrest would not have been an applicable exception to the warrant requirement in this alternative line of investigation. For these reasons, we conclude that the State has failed to establish that a reasonable probability exists that the contraband in Barnes's pockets would have been inevitably discovered apart from the unlawful conduct with this argument. Accordingly, the third assignment of error is overruled.

*First Assignment of Error*

**{¶38}** The State argues that the trial court erred in concluding that Patrolman Risner needed a reasonable suspicion to summon the canine unit and in concluding that the traffic stop was prolonged to accommodate the arrival of the canine unit.

Legal Standard

**{¶39}** Pursuant to App.R. 12(A)(1)(c), courts of appeals are to render a decision on each assignment of error raised "unless an assignment of error is made moot by a ruling on another assignment of error * * *." "An assignment of error is moot when it cannot have 'any practical legal effect upon a then-existing controversy.'" *State v. Gideon*, 2020-Ohio-6961, ¶ 26, quoting *Ex parte Steele*, 162 F. 694, 701 (N.D.Ala. 1908). "Put differently, an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court." *Gideon* at ¶ 26.

Legal Analysis

**{¶40}** In the prior two assignments of error, we have already concluded (1) that the trial court did not err in determining that Patrolman Risner did not have reasonable suspicion or probable cause to search Barnes's pockets after Officer Yoder had performed a protective pat-down search of his person and (2) that the State failed to establish that the methamphetamines would have been inevitably discovered. These grounds provided a sufficient basis for the trial court to grant the motion to suppress. Accordingly, whether the traffic stop was prolonged to

accommodate the arrival of the canine unit is of no consequence to the disposition of this appeal. Since the resolution of the second and third assignments of error renders the issues in the first assignment of error moot, we decline to address the arguments raised herein pursuant to App.R. 12(A)(1)(c).

*Conclusion*

**{¶41}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Hardin County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**WALDICK and MILLER, J.J., concur.**

**/hls**